

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-08-00216-CR
_____

DERAN DARCELL PEOPLES, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th Judicial District Court
Gregg County, Texas
Trial Court No. 35603-B

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

A jury found Deran Darcell Peoples guilty of one count of aggravated robbery (TEX. PENAL CODE ANN. § 29.03 (Vernon 2003)), three counts of robbery (TEX. PENAL CODE ANN. § 29.02 (Vernon 2003)), and one count of burglary of a habitation (TEX. PENAL CODE ANN. § 30.02(c)(2) (Vernon 2003)). He was sentenced to twenty years' imprisonment on the aggravated robbery charge and fifteen years' imprisonment on each of the other three charges, all to run concurrently.

Peoples appeals, complaining that the evidence was both factually and legally insufficient to sustain his conviction and claiming, further, that the sentences he received were disproportionate to the offenses of which he was convicted.

**FACTS**

Each of the charges arise from an event which occurred in Longview, Gregg County, Texas, December 29, 2006. At that time, David (sometimes called Jay or Jeremy) Baker, Holly Croxton, and Charles Parker were all visiting with Norman Hagler in Hagler's duplex apartment, where they had settled in to share a few beers and watch television. The four had all formerly been acquaintances or friends in high school; Hagler and Croxton were then currently in a dating relationship and Parker often stayed for days at a time, sleeping on the couch.

During the evening, a knock was heard at the rear door of the residence, and Hagler answered the knock. After he exchanged words with the visitor, Hagler related to the others that the person at the door was asking for someone whom Hagler did not know, a circumstance that Baker described

2

as a little weird. This apparently made some of the occupants a bit edgy because after this, Hagler and Parker went into the bedroom of the duplex and retrieved two pistols, Parker putting a pistol on a table beside him, and Hagler apparently taking another into the kitchen.

Not long after this, the rear door of the duplex burst open and three masked assailants (two black males and one Caucasian female) rushed in. According to Baker, one of them said, "Don't move," and according to Croxton, they shouted, "Give us all your money and this is not a joke." Chaos erupted and it is difficult to tell the exact chronology of events. Hagler, who had gone into the kitchen just before the intrusion, almost immediately turned to find one of the assailants pressing a pistol to his temple and screaming a demand for money. Hagler wrestled the man to the ground. Parker grabbed the gun beside him. Gunshots almost immediately rang out and a hail of bullets flew, Hagler estimating that there were at least fifteen to twenty shots fired. Croxton ran to the bedroom, locked the door, climbed in the closet, and covered herself with clothes. Baker dived to the floor and crawled behind a bar. Then, in the words of Hagler, "[I]t just happened so quick, they all run off and then it's dead silence and everything cut off and they were gone, and Charlie [Parker] was hit."

With the volley of bullets which pierced the air of the duplex, amazingly, only two bullets hit human flesh. Parker was seriously injured with a single shot to the abdominal area.[1] Another bullet hit one of the assailants. For reasons not explained at trial, after placing an emergency 9-1-1

---

[1]Parker was hospitalized for about two weeks, receiving some eighty units of blood. The bullet had gone through his sciatic nerve, severing the nerve serving his left leg, and damaged his aorta. At trial, almost two years later, Parker was still forced to use a cane to walk and continued to suffer extreme pain.

call, the occupants of the duplex took the guns remaining in the house and restored them to their previous site under the bed in the bedroom. None of the occupants of the duplex could describe the assailants other than to indicate that there were two black men and one white woman. Parker could remember nothing at all of the incident, but testified as to his debilitating injuries sustained by the gunshot wound.

Within a short time after the emergency 9-1-1 operator received the call concerning the above events and requesting an ambulance for Parker, Longview police were notified that a dead body had been discovered beside an automobile parked in the parking lot at the Hidden Hill Apartments, only about one-fourth of a mile from Hagler's duplex.

The resulting investigation showed the body to be that of George Sanders, killed by a wound inflicted by a bullet from a .45 caliber gun, the same caliber gun used by Parker during the attack on the duplex. Also in the bloody interior of the automobile were a partially-crushed A&W root beer can and a .38 caliber pistol. Tests revealed that the pistol taken from the car was the same one fired at Hagler's apartment by the assailants, the blood on the side of the root beer can bore Peoples's thumb print,[2] and the bullet which killed Sanders was fired from the gun used by Parker during the attack on the Hagler duplex.

Over a month after the incident and after he heard that he was being sought by the authorities, Peoples contacted the police and, after having been provided with the requisite warnings, consented

_____

[2]Peoples's fingerprints were already on file with the police department.

to a taped interview. In the taped interview which was played for the jury, Peoples admitted having been present with Sanders at Hagler's duplex on the night of the shooting. However, his story varied substantially from that of the occupants of Hagler's duplex in that he denied ever having entered the apartment or having made any demands on the occupants. According to Peoples, he had been riding around in a car with Sanders (whom Peoples characterized as his "home boy" and with whom he often spent the night) and smoking marihuana. The two encountered a white girl (whose name Peoples indicated that he did not remember) at a party and the three of them decided to restock their marihuana. The girl indicated that she knew a place where marihuana could be bought, so they got into Sanders's car, the girl directing them to Hagler's duplex. Peoples said that he had money in his pocket and expected to purchase the drugs. After Sanders drove the car behind the duplex, they exited the car and the girl led, followed in line by Sanders and Peoples to the rear door of the duplex. As they stepped up to the open rear door, the girl entered the door and Sanders pulled out a pistol, stepped through the back door, and grabbed one of the occupants of the duplex, who was standing near the door. Peoples (who steadfastly maintained that he "never made it to the door sill" and never entered the duplex) looked through the doorway and saw an occupant of the duplex, who was sitting on a couch, reach under the couch upon which he was sitting and withdraw a pistol. When shots rang out immediately after that, Peoples instantly ran off through the woods behind the duplex, hurrying back to the Hidden Hills apartments, where Sanders lived. There, he discovered Sanders's

5

dead body in the parking lot beside the white car in which they had earlier been riding together. Peoples himself called the police to report the dead body.

**CLAIM OF FACTUAL INSUFFICIENCY AND LEGAL INSUFFICIENCY OF THE EVIDENCE**

When both the legal and factual sufficiency of the evidence are challenged, we must first determine whether the evidence is legally sufficient to support the verdict. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). Legally sufficient evidence supporting a conviction exists if the court, after reviewing the evidence in the light most favorable to the prosecution, determines that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Clewis*, 922 S.W.2d at 132–33. All of the evidence is reviewed, but evidence that does not support the conviction is disregarded. *See, e.g.*, *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). If the legal sufficiency challenge is sustained, then a judgment of acquittal must be rendered. *Clewis*, 922 S.W.2d at 133.

If the evidence is legally sufficient to support the verdict, we then proceed with a factual sufficiency review. *Id.* In our factual sufficiency review, we evaluate all the evidence without employing the prism of "in the light most favorable to the prosecution." *Id*. at 129. We consider all of the evidence, comparing evidence that tends to prove the existence of disputed facts with evidence that tends to disprove such facts. *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). We should set aside the verdict only when the factual finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Clewis*, 922 S.W.2d at 135. In

6

doing so, we must be mindful that the jury is the sole judge of the weight and credibility of witness testimony. *Santellan*, 939 S.W.2d at 164. Although a factual sufficiency review authorizes an appellate court, to a very limited degree, to act as a "thirteenth juror," the appellate court must nevertheless give the jury's verdict a great degree of deference. *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009) (citing *Watson v. State*, 204 S.W.3d 404, 416–17 (Tex. Crim. App. 2006)).

The Texas Court of Criminal Appeals has determined that our review of both factual sufficiency and legal sufficiency should be examined under the principles of review for a hypothetically correct jury charge. *Grotti v. State*, 273 S.W.3d 273, 280 (Tex. Crim. App. 2008). A hypothetically correct charge accurately promulgates the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

Using the hypothetically correct jury charge analysis, we first look at the things that the State was obligated to prove under the three robbery charges as they pertain to Peoples's actions against Hagler, Croxton, and Baker, each in violation of Section 29.02 of the Texas Penal Code. Since the analysis would be the same for each of these charges (except as to the identity of the victim), they are examined together. The State needed to show that (1) Peoples, acting either alone or as a party

7

(2) during the course of a theft (3) intentionally or knowingly (4) placed Hagler, Croxton, and Baker in fear of imminent bodily injury or death.

Applying the hypothetically correct jury charge analysis to the aggravated robbery charge as it pertains to his actions against Parker in violation of Section 29.03 of the Texas Penal Code, it was necessary for the State to prove that (1) Peoples, acting either alone or as a party (2) during the course of a theft (3) intentionally, knowingly, or recklessly (4) caused bodily injury to Parker, and (5) the injury to Parker was a serious bodily injury.

Proceeding to the burglary charge, under the hypothetically correct jury charge analysis, we find that in order for the State to prove its charge that Peoples was guilty of violating Section 30.02(c)(2) of the Texas Penal Code, it was incumbent on the State to show that (1) Peoples, (2) without the effective consent of the owner, (3) entered (4) a habitation (5) with the intent to commit (or committed or attempted to commit) a felony other than felony theft.

The jury was instructed on the law of parties.

The testimony of the three occupants of the duplex who could remember the incident established affirmatively that the duplex was the residence or habitation of Hagler, that the assailants stormed the place demanding money, that at least one of the assailants was armed, that each of the occupants was terrified, that Parker was seriously wounded by gunfire, and that at least Sanders and the white girl accompanying Sanders and Peoples entered the duplex without the consent of the occupants.

8

Peoples's interview affirmed that entry was made into the duplex by at least two of the three people in his group, that Sanders pulled a gun and made demands, and that gunfire erupted. Peoples's sole argument in his defense was that he was unaware that any robbery was planned by Sanders and/or the white girl accompanying them and that Peoples neither entered the duplex nor handled a weapon.

The jury could infer Peoples's intent to participate with Sanders in the illegal activity from the circumstances which they heard described. They chose to disbelieve his avowals of surprise that had Sanders produced a gun from apparent nothingness.

A rational trier of fact could have easily found the essential elements of each of the offenses beyond a reasonable doubt. The factual findings necessary to support the verdicts are not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. Accordingly, the evidence was both legally sufficient and factually sufficient to sustain the verdict of the jury.

**CLAIM OF DISPROPORTIONATE SENTENCING**

Texas courts have traditionally held that so long as the punishment assessed is within the range prescribed by the Legislature in a valid statute, the punishment is not excessive, cruel, or unusual. *See, e.g.*, *Jordan v. State*, 495 S.W.2d 949, 952 (Tex. Crim. App. 1973). Here, Peoples's sentences on all of the charges fall within the ranges set by law.[3] However, that single test does not

---

[3]Aggravated robbery is a first-degree felony (TEX. PENAL CODE ANN. § 29.03); robbery is a second-degree felony (TEX. PENAL CODE ANN. § 29.02); and burglary of a habitation is a first-degree felony (TEX. PENAL CODE ANN. § 30.02(c)(2)). A first-degree felony is punishable by imprisonment for life or for any term of not more than ninety-nine years or less than five years and/or

end the inquiry. A prohibition against grossly disproportionate punishment survives under the Eighth Amendment to the United States Constitution apart from any consideration of whether the punishment assessed is within the range established by the Legislature. U.S. CONST. amend. VIII; *see Solem v. Helm*, 463 U.S. 277, 290 (1983); *Harmelin v. Michigan*, 501 U.S. 957 (1991) (Scalia, J., plurality op.); *Jackson v. State*, 989 S.W.2d 842, 845 (Tex. App.—Texarkana 1999, no pet.); *Lackey v. State*, 881 S.W.2d 418, 420–21 (Tex. App.—Dallas 1994, pet. ref'd); *see also Ex parte Chavez*, 213 S.W.3d 320, 323–24 (Tex. Crim. App. 2006) (describing this principle as involving a "very limited, 'exceedingly rare,' and somewhat amorphous" review).

*Solem* had suggested, as a three-part test, that an appellate court consider: (1) the gravity of the offense compared with the harshness of the penalty; (2) the sentences imposed for similar crimes in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other jurisdictions. *See Solem*, 463 U.S. at 292. *Harmelin* at least raised questions about the viability of the *Solem* three-part test. In fact, it was subsequently held that proportionality survived *Harmelin*, but that the *Solem* three-part test did not. *See McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992); *Lackey*, 881 S.W.2d at 420–21. In light of *Harmelin*, the test has been reformulated as an initial threshold comparison of the gravity of the offense with the severity of the sentence, and then,

a fine of not more than $10,000.00. TEX. PENAL CODE ANN. § 12.32 (Vernon 2003). A second-degree felony is punishable by imprisonment for any term of not more than twenty years or less than two years and/or a fine of not more than $10,000.00. TEX. PENAL CODE ANN. § 12.33 (Vernon 2003).

only if that initial comparison created an inference that the sentence was grossly disproportionate to the offense should there be a consideration of the other two *Solem* factors: (1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions. *McGruder*, 954 F.2d at 316; *Mullins v. State*, 208 S.W.3d 469, 470 (Tex. App.—Texarkana 2006, no pet.); *Lackey*, 881 S.W.2d at 420–21.

Rather than these relevant factors, Peoples's sole arguments on appeal that the sentence received by him was disproportionate were: (1) that although Peoples was twenty-seven years old, he had never been convicted of a felony; (2) Peoples expressed remorse during his taped interview that one of the victims had been injured so severely; (3) that Peoples was not the "shooter" who had inflicted the injury; and (4) that Peoples claimed ignorance that Sanders, his "home boy," intended to commit any crime.

Although Peoples filed a motion for new trial wherein he included the claim of disproportionate sentencing, he presented no evidence to that effect. As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court and that the trial court either ruled or refused to rule on that complaint. TEX. R. APP. P. 33.1(a). The complaint must be sufficiently specific to make the trial court aware of the grounds of the complaint. *Tucker v. State*, 990 S.W.2d 261, 262 (Tex. Crim. App. 1999). A motion for new trial is but a pleading and the allegations therein do not prove themselves, but must be proved. *Zaragosa v. State*, 588 S.W.2d 322 (Tex. Crim. App. [Panel Op.] 1979); *Mackey v. State*, 480 S.W.2d 720 (Tex. Crim.

11

App. 1972). The burden of proof is on the movant in a motion for new trial. No proof was provided to the trial court. Therefore, even had the burden been met at the appellate level to show the imposition of a disproportionate sentence, this claim is not adequately presented for appeal.[4]

    We affirm.


                                        Bailey C. Moseley
                                        Justice


Date Submitted:      July 30, 2009
Date Decided:        July 31, 2009

Do Not Publish

---

[4]We note that even if Peoples's arguments of disproportionate sentencing made on appeal had been presented to the trial court and an adverse ruling been obtained, the arguments fall very short of the requirements to demonstrate that Peoples received disproportionate sentences.